E. Turgeon Construction Co., Inc. v. Commissioner.
E. Turgeon Constr. Co. v. Commissioner
Docket No. 58412.
United States Tax Court
T.C. Memo 1960-4; 1960 Tax Ct. Memo LEXIS 283; 19 T.C.M. (CCH) 5; T.C.M. (RIA) 60004; January 27, 1960
Peter Palombo, Jr., Esq., for the petitioner. Manning K. Leiter, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency in the income tax of petitioner for the fiscal year ended April 30, 1950, in the sum of $18,917.76. To some extent this deficiency resulted from respondent's determination that petitioner's net operating loss carryback from the fiscal year ended April 30, 1951, was $644.03 instead of $32,281.93 as disclosed in petitioner's return for the fiscal year ended April 30, 1951. One of the items involved in respondent's reduction of this net operating loss carryback was the disallowance *284 of a deduction on account of interest in the amount of $12,741.67, paid by petitioner to Evangeliste Turgeon in the fiscal year ended April 30, 1951, which respondent determined was not deductible in that year. Other adjustments made by respondent in his notice of deficiency relating to the fiscal years ended April 30, 1950 and 1951, which were put at issue by the original petition filed herein, have been settled by the parties. By an amendment to the petition petitioner alleges that it is entitled to an additional deduction in the fiscal year 1950, not claimed in its return for that year, on account of an amount of $10,020.17 paid to a subcontractor of petitioner in excess of the original subcontract price which petitioner alleges accrued in the fiscal year ended April 30, 1950, although it was not paid until August 21, 1951. By an amendment to the answer respondent asks an increased deficiency in the amount of $4,225.98. With regard to this issue respondent contends that whereas in the notice of deficiency he disallowed the sum of $41,379, claimed as a deduction on account of addition to a reserve for contingent contract losses, he should have disallowed the entire amount of *285 that reserve in the sum of $52,500. Findings of Fact Some of the facts herein were stipulated by the parties. The stipulation and the exhibits attached thereto are made a part of our findings by this reference. E. Turgeon Construction Co., Inc., the petitioner in this proceeding, is a corporation organized and existing under the laws of Rhode Island. It is hereinafter sometimes referred to as "the corporation." It was incorporated on May 7, 1946, and has its principal office at 42 Weybosset Street, Providence, Rhode Island. The corporation's corporate income tax returns for the taxable years ended April 30, 1950, and April 30, 1951, were filed with the then collector of internal revenue for the district of Rhode Island. At all times pertinent hereto the corporation was engaged in the general contracting business, specializing in the construction, reconstruction, and repair of buildings. It was customary for the corporation to be occupied with the work on several contracts simultaneously. Most of these contracts were of a long-term nature; the period from the execution of the contract to the completion and acceptance of the work of the contract was greater than 1 year. The corporation *286 reported profit and loss on such construction contracts in the year of completion. It was on an accrual basis of accounting for income and expenses not attributable to the long-term contracts. Evangeliste Turgeon, hereinafter sometimes referred to as "Turgeon," operated the construction business as a sole proprietorship from approximately 1900 until May 7, 1946, when he caused the corporation to be formed and transferred to it the assets of his business, subject to liabilities. At all times relevant herein the four sons of Evangeliste were the only officers and directors of the corporation. In 1946 the corporation became interested in submitting a bid for the construction of a Veterans Administration hospital at Providence, Rhode Island (hereinafter sometimes referred to as "the hospital"). An agent of a bonding company examined the books of the corporation in connection with the two bonds which the corporation would be required to submit if it made a bid and if the bid were accepted by the U.S. Army Corps of Engineers which was the agency of the Government responsible for the construction. These two bonds were the "bid bond" which would guarantee to the recipient of the bid that *287 if the corporation was awarded the contract it would enter into a final agreement, and the "performance and payment bond" which would guarantee payment by petitioner for all material used and labor employed in the construction of the hospital. On the basis of the balance sheet examination, the agent of the bonding company determined that it was doubtful that the bonds could be obtained in view of the underwriting requirement that a contractor such as petitioner corporation have working capital equal to approximately 10 per cent of the contract price. This requirement was necessitated by a feature of such contracts as the hospital contract whereby the Government retained a percentage of the contract price until completion of the work under the contract. The bonding company through its agent required that the corporation obtain $150,000 in additional working capital before it could furnish bonds. Evangeliste Turgeon agreed to advance the necessary $150,000. The bonding company agreed to furnish the bonds as they were required, and did so as agreed. The corporation submitted a bid on the hospital contract. In the summer of 1946 the corporation's bid on the hospital contract was accepted. *288 By an indemnification agreement dated August 30, 1946, Evangeliste Turgeon and his sons personally indemnified the bonding company from any loss on the performance and payment bond. On September 26, 1946, Evangeliste Turgeon loaned $150,000 to the corporation. At or about the same time he received $150,000 from Delphina Realty Company, another corporation, all of the stock of which he owned. This payment by Delphina Realty Company (hereinafter sometimes referred to as "Delphina") was credited on December 31, 1946, against the balance due him from pervious loans made by him to that company in the amount of $265,687.99. Delphina Realty Company borrowed $150,000 from the Industrial Trust Company of Providence, Rhode Island (hereinafter sometimes referred to as "the bank"), on September 26, 1946. The loan was at 4 per cent interest, payable semiannually, and was secured by a mortgage on real estate in the city of Providence. The bank was aware that Delphina was borrowing money which was to be used by petitioner corporation and which was required by petitioner in order to obtain a performance and payment bond from the bonding company. The agent of the bonding company had aided the *289 corporation in arranging for the loan to Delphina. Evangeliste Turgeon paid no amount of money to Delphina as interest on the $150,000 he received from that company. There was no agreement that he should pay interest on that sum. It was informally agreed and contemplated among the sons and Evangeliste Turgeon that Delphina would be reimbursed by the petitioner corporation for the amount of interest it was required to pay the bank on its loan of $150,000. The reimbursement was to take the form of interest payments to Evangeliste Turgeon on the $150,000 loan from him in an amount at least equal to the amount of interest which Delphina would be required to pay the bank on the $150,000 loan from it. It was informally agreed among the representatives of the corporation, Evangeliste Turgeon, and the agent of the bonding company that the loan of $150,000 by Evangeliste Turgeon would not be repaid until completion of the work on the hospital contract and that the corporation would not pay any interest on the loan until its completion. Delphina paid interest to the bank upon its $150,000 loan in the following amounts and on the following dates: Date
Interest Payment
March 25, 1947
$ 3,000.00
September 25, 1947
2,700.00
March 1948
2,400.00
September 1948
2,100.00
March 1949
1,800.00
June 25, 1949
741.67
Total
$12,741.67
*290 The $150,000 which the corporation borrowed from Evangeliste Turgeon was included in the general cash account of the corporation and was expended along with other corporate funds not only on the hospital contract but also on the other contracts during the 1946-1949 period. Construction on the hospital contract commenced in late September 1946. The last payment was made to the corporation in the amount of $42,576.79 on September 13, 1949. The next-to-last payment was made on June 7, 1949, in the amount of $290,022.46. These payments represented the retained percentage which the Government released upon completion and acceptance of the work. The work under the hospital contract was completed during the taxable year ended April 30, 1950. On June 10, 1949, the corporation repaid $100,000 of the $150,000 borrowed from Evangeliste Turgeon. On the same day Evangeliste Turgeon advanced $100,000 to Delphina. On January 3, 1950, the corporation repaid the remaining $50,000 of principal to Evangeliste Turgeon. At or about the same time Evangeliste Turgeon advanced $50,000 to Delphina. On June 27, 1950, the corporation paid the amount of $12,741.67 interest to Evangeliste Turgeon on *291 the $150,000 it borrowed and repaid. No amount of interest other than this was ever paid on the loan. Delphina recorded its loan of $150,000 from the bank as a credit to its "Mortgages Payable" account on December 31, 1946. The account showed a credit balance of that sum after this entry. Debits to that account were made in the following amounts and on the following dates: $ 15,000
March 25, 1947
15,000
September 25, 1947
15,000
March 25, 1948
15,000
September 25, 1948
15,000
March 25, 1949
75,000
June 24, 1949
Total
$150,000 The account was closed out on June 24, 1949. Except for the credit entry of $50,000 on January 3, 1950 (recording the payment of the remainder of the $150,000 advanced to Evangeliste Turgeon in 1946), there was no entry of a credit to the "Notes payable - E. Turgeon" account on Delphina's books for calendar 1950 which would record a payment on behalf of Evangeliste Turgeon to Delphina of the $12,741.67 in interest paid over to him by the corporation in that year. The corporation recorded and reported its general administrative expenses on an accrual basis of accounting. It was customary for the corporation, when *292 it borrowed money for use in its contracting business, to treat the interest paid on such indebtedness as a general administrative expense. Evangeliste Turgeon reported the $12,741.67 interest payment to him by the corporation on June 27, 1950, as part of his receipts on Schedule C of his personal income tax return for the calendar year 1950. He claimed no deduction for interest paid on that return. Theodore Galassi, d/b/a Capitol Marble & Tile Company, was the subcontractor of the corporation for a portion of the work on the hospital contract. On March 24, 1949, Theodore Galassi (hereinafter sometimes referred to as "Galassi") instituted litigation in the Superior Court of the State of Rhode Island against the corporation on a claim for extra work performed by Galassi on the hospital contract, for expenses incurred in the work as a result of "interruption and delay" on the part of the corporation, and for work or services already rendered. Prior to April 30, 1950, several conferences were held between lawyers representing Galassi and the corporation in an attempt to settle the dispute out of court. The corporation claimed chargebacks against Galassi. Petitioner established a $25,000 *293 reserve for this litigation in the fiscal year ended April 30, 1950, and a $15,000 reserve in its fiscal year 1951. The corporation retained the same percentage of its subcontract price for the work done by Galassi as the Government retained of the contract price. The subcontract price was $180,000; the corporation retained $18,000 until completion of Galassi's work. At the time the litigation was instituted by Galassi the corporation had paid approximately $9,000 of the retained percentage to Galassi. Because of the dispute as to the amount still owed Galassi, the corporation continued to withhold payment of the remainder of the retained percentage, approximately $9,000. On January 31, 1949, there was a "Net Amount Sub-Contract" balance in the "Account With Sub-Contractor" of the corporation of $9,979.83, which represented the retained percentage not yet paid Galassi. The "Amount Completed" balance with regard to the Galassi subcontract as of that date was $181,213.88. An entry on July 31, 1951, showed a balance in "Net Amount Sub-Contract" of $20,000, an increase of $10,020.17 over the previous entry. This addition was included in the "Amount Completed" balance (the final figure *294 in that balance) of $191,234.05, representing the total cost of the work Galassi performed under the hospital contract. The $20,000 figure was the recordation of a payment to the estate of Theodore Galassi on August 21, 1951, in settlement of the disputed claims and included the $9,979.83 of retained percentage withheld when the subcontractor brought suit. Petitioner deducted $10,020.17 of this payment in the fiscal year ended April 30, 1952. Galassi died before the corporation paid the amount of $20,000 agreed upon in settlement of his claims against the corporation. His counsel continued the negotiations as representative of his estate. The amount of $20,000 was suggested by him as a possible settlement figure on April 13, 1950, in a meeting between the counsel of Galassi and the corporation, but no officer of petitioner agreed to the settlement at this figure or considered that a settlement of this claim had been made until after the beginning of petitioner's fiscal year ended April 30, 1952. This settlement was recorded with the Superior Court of the State of Rhode Island on August 20, 1951. During the period 1946 through 1951 the corporation followed an accounting practice, *295 both in keeping its books and in reporting income for Federal tax purposes, of establishing reserves for contingent costs and expenses on uncompleted construction contracts. A reserve would be opened in one year and the amount credited thereto would be deducted from income in that year. If no payment of the account covered by the reserve was made the bookkeeping entry was reversed in the following year by closing out the amount in the reserve account at the start of that fiscal year, thereby increasing income by the amount of the reserve. If the contract was not completed in that year it was customary for the corporation to reestablish the reserve resulting in another deduction from income in the same amount as was closed back to income and to further deduct an amount it deemed necessary to meet new contingencies on contracts not completed in that year. If the contract was completed in that year it was customary for the corporation, if its contingent liability had been determined, to deduct the amount of the expense or cost from income as part of the cost of the completed contract (under the completedcontract system of accounting). In so far as the hospital contract was concerned, *296 the credits to the reserve account, decreasing income, and the charges to that account, increasing income, were as follows: Fiscal Year
Credits and
Ended
(Charges)
4/30/47
$ 25,000
4/30/48
(25,000)
61,898
4/30/49
(61,898)
11,121
4/30/50
(11,121)
25,000
4/30/51
(25,000)
15,000
Balance 4/30/51
15,000
The credit during the fiscal year ended April 30, 1949, in the amount of $11,121 was the anticipated net cost of two items: A debit to purchases and subcontracts and a credit to accounts payable, Superior Fireproof Door Company, in the amount of $11,573; and a debit to accounts payable and a credit to purchases and subcontracts, Capitol Marble & Tile Company, in the amount of $452.50 (the fifty cents being unaccounted for). In the fiscal year ended April 30, 1950, the reserve in the amount of $11,121 was closed out and was included in petitioner's income for that year. At the same time a new reserve in a larger amount was created which included the $11,121 item as appears more explicitly later in these findings. The hospital contract was completed during that year, and the corporation computed its profit on the hospital contract (by subtracting *297 total costs as of April 30, 1950, from total billings as of that date). The amount of profit was $66,515.91 ($4,885,717.09 in total billings minus $4,819,201.18 in total costs) which it reported as income on the hospital contract for the taxable year ended April 30, 1950. The figure of $4,819,201.18 included the cost amount of $11,121 previously deducted in fiscal year ended April 30, 1949, and added back to income in fiscal year ended April 30, 1950, as part of the $4,885,717.09 from which the cost figure was subtracted. The Commissioner's notice of deficiency disallowed additions to the contingency reserves (for all contracts) in the net amount of $41,379 for the taxable year ended April 30, 1950. The reserve account for all contracts, including the hospital contract, showed the following credits and charges for the fiscal years ended April 30, 1950, and April 30, 1951. (the charges appear in parentheses): Fiscal Year
All Contract
Ended
Reserves
4/30/50
($11,121)
52,500
4/30/51
(52,500)
65,000 These reserve credits and charges included the reestablishment of a reserve for the hospital contract of $25,000 (credit) in the fiscal year ended April 30, 1950, as *298 an anticipated contingent additional expense arising out of the Galassi subcontract. As was customary, the corporation reversed the reserve credit and charged the same amount to the reserve (as part of the $52,500 charge above) in fiscal year ended April 30, 1951, increasing income by $25,000 in that year. As part of the $65,000 credit to the reserve above in fiscal year ended April 30, 1951, it again reestablished a reserve for the hospital contract in the amount of $15,000, once again to cover the anticipated cost of the Galassi settlement. The figure $41,379 disallowed by the Commissioner was the result of his computation in netting the charge to the reserve of $11,121 against the credit to the reserve of $52,500 in the fiscal year ended April 30, 1950. (He disallowed an addition-to-reserve deduction of $12,500 in taxable year ended April 30, 1951 - the difference between the credit and charge in that year.) Opinion KERN, Judge: The first issue to be resolved herein involves two questions: (1) Whether petitioner corporation which consistently reported its gross income from long-term contracts in "the taxable year in which the contract is finally completed and accepted" but was *299 on an accrual basis of accounting was required to accrue part of the $12,741.67 paid by it as interest on the loan of $150,000 from Evangeliste Turgeon in each of the taxable years and in the amounts which Delphina paid interest on its $150,000 loan from the bank, or could deduct the entire amount in the taxable year ended April 30, 1951, when the interest was in fact paid by the corporation, and (2) whether the corporation should properly have accrued the total amount of interest in the year in which the hospital was completed as an expenditure "during the life of the [long-term] contract which [was] properly allocated thereto" in accordance with section 42 of the Internal Revenue Code of 1939 and section 29.42-4(b) of Regulations 111 promulgated thereunder. [1]
*300 Respondent disallowed a deduction in the amount of the total interest payment of $12,741.67 in computing the proper net operating loss in the taxable year ended April 30, 1951, to be carried back to the taxable year ended April 30, 1950, as a net operating loss deduction in that year. He argues that the only deduction allowable in the taxable year ended April 30, 1950, with regard to the interest was in the amount of $741.67, the amount which Delphina paid the bank in that year and which under the understanding accompanying the loan arrangement determined the liability and amount of the liability to pay interest on the corporation's loan from Evangeliste Turgeon. Respondent's contention is that the liability for the payment of interest by petitioner to Evangeliste was fixed as Delphina made its payments to the bank with only the time of payment deferred until the hospital contract was completed. Petitioner argues that there was no accruable obligation to pay interest to Evangeliste prior to the year of its actual payment and, in the alternative, it argues that if the proper treatment of the interest expense was not as a deduction in computing the net operating loss carryback for *301 the fiscal year ended April 30, 1951, but was accruable in a year prior to payment then the total interest expense of $12,741.67 should be considered to be a cost of the hospital contract, "properly allocated thereto," and therefore deductible in full in the taxable year ended April 30, 1950, when the contract was completed. For the purposes of this opinion we will assume, without deciding, that the respondent is correct in his contention that interest payable by petitioner to Evangeliste was accruable by the corporation at the same times and in the same amounts as the payments by Delphina to the bank of interest on its loan, the events which fixed the liability (and amount thereof) of the corporation to pay Evangeliste Turgeon interest. However, even though the corporation was an accrual-basis taxpayer, it consistently reported its income from long-term contracts in "the taxable year in which the contract [was] finally completed and accepted * * *." These two concepts are not inconsistent. See R. G. Bent Company, 26 B.T.A. 1369, 1374. We are of the opinion that under the facts of the instant case petitioner should be permitted to deduct the total amount of the *302 interest paid to Evangeliste in the year of the completion of the hospital contract. Although the proceeds of the loan from Evangeliste were deposited in petitioner's general account, we are convinced by the evidence herein that the loan was made solely for the purpose of obtaining the hospital contract, that the interest was a cost necessitated by the submission of its bid for and the execution of such contract, and that the use of the proceeds of the loan was for all practical purposes only during the period of the contract so that the interest which accrued on such loan was in principle just as much a part of the cost of that contract as were more obviously direct costs thereof. We therefore conclude that the interest paid by the corporation to Evangeliste Turgeon, insofar as it accrued prior to April 30, 1950 (and all of the interest had so accrued), was deductible for the taxable year ended on that date as an expenditure "during the life of the contract which [was] properly allocated thereto * * *." The second question herein presented is whether the corporation was entitled to accrue a deduction in the amount of $10,020.17 in the taxable year ended April 30, 1950. This amount *303 represents that part of the sum of $20,000 (paid in settlement of the Galassi dispute in the taxable year ended April 30, 1952) in excess of the $9,979.83 which the corporation withheld as a percentage of the subcontract price (and which it accrued and deducted in the taxable year ended April 30, 1950). If petitioner's liability to pay this amount was being disputed by it during the fiscal year ended April 30, 1950, the claim was "contingent and uncertain" and could not be deducted by it then even though the long-term contract to which it was attributable was completed in that year. See A. D. Irwin, 24 T.C. 722, affd. 238 F.2d 874. Petitioner argues that the litigation between the corporation and Galassi was settled on April 13, 1950, when, so it contends, the $20,000 payment was agreed upon, and that "the $10,020.17, which was in excess of the subcontract price, can be deducted as a cost of the * * * [hospital] contract" in the stipulated year of completion of that contract, the taxable year ended April 30, 1950. Respondent admits that $9,979.83 of the $20,000 was held back as a protective measure when Galassi commenced the litigation and that it represented *304 the balance due for work originally specified in the subcontract, and respondent concedes that that amount was properly recorded as a cost of the hospital contract "prior to April 30, 1950," and that it was properly subtracted in determining the contract profit reported in that year. However, as to the $10,020.17 which "was not recorded on petitioner's books prior to April 30, 1950," respondent argues that this amount, relating to "extra work" under the subcontract, was a disputed one, and that settlement of the dispute did not occur prior to April 30, 1950. Obviously the petitioner has the burden of proof on this issue. Petitioner did not take this deduction in the year in which it now contends it should properly have been taken. Its books do not indicate that this litigation was settled until a later year. Petitioner's treasurer and one of its four stockholders testified that he did not know when the litigation was settled. Petitioner's accountant testified that he was not informed that this litigation was settled until the fiscal year ended April 30, 1952. If this litigation had been settled in April 1950 (after petitioner had received from the Government all payments due *305 under the construction contract here involved), it would seem strange that no payment was made thereunder until August 1951. The only testimony supporting petitioner's contention is that of the attorney for Galassi (and his estate) who had no clear recollection of the event but testified that it was his opinion that some fragmentary penciled notes in his file indicated that a settlement was arrived at in April 1950. Upon the record before us we conclude that petitioner has not borne his burden of proof upon this issue. The third question, raised herein by respondent's amended answer and upon which he has the burden of proof, concerns the proper treatment during the taxable year ended April 30, 1950, of the amount of $11,121 which initially appeared on the books of the corporation in the taxable year ended April 30, 1949, as an anticipated net cost (of purchases and subcontracts properly allocable to the hospital contract) item and an offsetting entry to accounts payable, for which a contingent reserve account was created in that year, decreasing income as recorded and having the effect of a deduction. As was customary in the accounting procedure of the corporation, this reserve *306 account was reversed in the taxable year ended April 30, 1950, having the effect of increasing income as reported for that year by $11,121. However, a larger reserve account was established for that year which included the $11,121 and this new reserve account was deducted from income. Because that year was the taxable year of completion of the hospital contract to which the net cost was "properly allocated," the costs of that contract used in computing "income" under the completed-contract system of accounting also included the amount of $11,121. The overall effect of these accounting steps with regard to the $11,121 item was to produce a "wash" of the addition to income by the creation and deduction of the new reserve account, and the cost deduction in the taxable year ended April 30, 1950, resulted in only one deduction in that year of the $11,121 item. Thus only one deduction for the anticipated net cost item of $11,121 resulted in fiscal year 1950, although a deduction had been taken in the same amount in a year prior to the year when the contract to which it was properly allocated was completed. As respondent says in his brief by way of understatement "[the] form of the deduction *307 is confusing." Respondent, in his statutory notice of deficiency, as an explanation of an adjustment for the taxable year ended April 30, 1950, by which $41,379 of deductions for the creation of a contingent reserve in the amount of $52,500 was disallowed (and a similar item of $12,500 in the taxable year ended April 30, 1951, was disallowed in the computation of a net operating loss carryback) said: "It is determined that the additions to a reserve for contingent contract losses in the amounts of $41,379.00 and $12,500.00 for the fiscal years ended April 30, 1950 and April 30, 1951, respectively, are not allowable deductions, as claimed, from income in accordance with the provisions of Section 29.42-4(b) of Regulations 111 or under any provision of Section 23 of the 1939 Internal Revenue Code as amended." The effect of this was to inform the corporation that the use of contingent reserves and the customary creation of such a reserve, and reversal thereof in the next year (and re-creation and re-reversal in a subsequent year if the contract to which properly allocated was not yet completed), were improper. The only exception which the respondent made in his deficiency notice *308 was as to the $11,121 ($52,500 less $41,379) which the corporation deducted as part of the entry whereby a new reserve in the amount of $52,500 was created in the taxable year ended April 30, 1950. The effect of this exception was to give the corporation a second deduction for the net costs amount of $11,121 in the taxable year ended April 30, 1950 (since the corporation had also deducted the $11,121 as a cost of the hospital contract completed in that year), which in effect "washed out" the inclusion into income of this amount resulting from the several entries relating to the reserve for the prior year. The corporation, as it concedes, was incorrect in establishing and reversing and reestablishing and re-reversing the contingent reserves. Such a procedure was inconsistent both with the requirements and the purpose of the completed-contract method. As respondent states in his brief "[the] notice of deficiency in effect directed the petitioner to change to a pure completed contract method." Such a direction was entirely proper. The adjustments made by respondent in his notice of deficiency to petitioner's income for fiscal year 1950 accurately accomplished this for that year *309 since by allowing the deduction of $11,121 of the reserve he washed out the erroneous inclusion into income of that amount resulting from the several entries at the start of that year, and only one deduction of this amount resulted in the place it should have appeared and at the time it should have been taken, to wit in the costs deducted in the year of the completion of the contract. However, respondent now contends that this apparently correct result of this original determination was in reality incorrect for the basic reason, as we understand his argument, that a deduction in the same amount was erroneously taken by petitioner in the preceding year by reason of its use of these contingent reserves, and he is barred by the statute of limitations from making adjustments relating to this prior year. In effect respondent in his amended answer seeks to distort petitioner's taxable income for the fiscal year 1950 in order to compensate him for an error in petitioner's reported income for a prior year with regard to which respondent can make no direct adjustments by reason of the statute of limitations. Respondent has not cited to us any statute or authority which would justify such *310 action. On this issue our decision is for petitioner. Decision will be entered under Rule 50. Footnotes
1. Regulations 111: SEC. 29.42-4. Long-Term Contracts. - * * * * * *
(b) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion.↩